## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED TRANSPORTATION UNION**<br>**14600 Detroit Avenue**<br>**Cleveland, Ohio 44107**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**BNSF RAILWAY COMPANY**<br>**2500 Lou Menk Drive**<br>**Fort Worth, Texas 76161-2888,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.:**_____ |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE
### RELIEF UNDER THE RAILWAY LABOR ACT

Plaintiff United Transportation Union ("UTU"), pursuant to the Declaratory Judgments Act,

28 U.S.C. § 2201, and the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 - 163, brings this civil

action for declaratory and injunctive relief against the BNSF Railway Company ("BNSF"). UTU is

presently in collective bargaining negotiations with BNSF in national handling. The negotiations are

handled nationally with BNSF and various other railroad carriers, with the National Carriers'

Conference Committee ("NCCC") as their agent. These negotiations are handled under the RLA's

"major" dispute procedures. On March 2, 2006, by letter, BNSF invited UTU's General Committees

of Adjustment, among others, to discuss profit sharing, and to reach agreement by June 2006. This

invitation means BNSF is pulling out of national handling with respect to the issue of compensation

to handle it at the local level with the UTU General Committees. Compensation is a matter subject

to obligatory national handling under the RLA. Defendant BNSF's action in unilaterally pulling out

of national handling as to compensation clearly violates the RLA obligation "to make and maintain"

collective bargaining agreements under Section 2, First of the RLA, 45 U.S.C. § 152 First, entitling

UTU to declaratory and injunctive relief.

## PARTIES

1.      Plaintiff UTU is an unincorporated association serving as a labor union. UTU is a "representative" within the meaning of Section 1 Sixth of the RLA, 45 U.S.C. § 151, Sixth, and represents certain crafts or classes of Defendant BNSF employees, including trainmen and conductors. UTU's principal place of business is 14600 Detroit Avenue, Cleveland, Ohio 44107-4250. By and through its officials and officers, UTU conducts its business and acts for its members and other employees it represents in this judicial district.

2.      Defendant The BNSF Railway Company is a railroad transporting goods in interstate commerce, is a "carrier" within the meaning of Section 1 First of the RLA, 45 U.S.C. § 151 First, and is headquartered at 2500 Lou Menk Drive, Fort Worth, Texas 76161-2888. BNSF gave its power of attorney to negotiate in national handling to the NCCC, which is headquartered in Washington, DC.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question), § 1337 (Act regulating interstate commerce, *viz.,* the RLA), § 2001 (declaratory judgments) and § 1651 (the "All Writs Act"). In addition, it is well settled that federal district courts have jurisdiction to issue injunctions and enforce the requirements of the RLA. *See, e.g., Consolidated Rail Corp. v. Railway Labor Executives Ass'n,* 491 U.S. 299 (1989).

4.      Venue is properly laid in this judicial district under 28 U.S.C. § 1391 (b), because the Defendant is found in or is doing business in this judicial district and a substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

2

## CLAIM FOR RELIEF

### Collective Bargaining Under the Railway Labor Act

5.     Collective bargaining between railroads and their employees' representatives over rates of pay, rules and working conditions is governed by the RLA.  Collective bargaining agreements thereunder are amended through the service of written notice of intended changes in agreements affecting rates of pay, rules, or working conditions, pursuant to Section 6 of the RLA, 45 U.S.C. § 156. Such proposals, called "Section 6 notices," are negotiated in conferences between representatives designated and authorized by the carrier or carriers and by the collective bargaining representative of their employees. 45 U.S.C. §§ 152 Second; 156. If conferences fail, the dispute is subject to mediation by the National Mediation Board ("NMB"). 45 U.S.C. § 155 First. If mediation fails, the President of the United States may appoint a presidential emergency board ("PEB") to investigate and issue recommendations for settlement of the dispute. 45 U.S.C. § 160. Until these procedures are exhausted, and for thirty days thereafter, parties must maintain the status quo established by previous agreements and may not resort to self-help over the dispute.  45 U.S.C. §§ 152 First, 152 Seventh, 156, 160.

6.     The major railroads in the United States, including BNSF, normally bargain as a multi-employer group.  Multi-employer collective bargaining in the railroad industry is referred to as "national handling."  The national handling agent for BNSF, as well as the other railroads in this group, has been the National Carriers' Conference Committee ("NCCC").  National railroad unions, including the UTU, have designated national negotiating committees that have engaged in bargaining with the BNSF's national handling representative.  These negotiations have resulted in national agreements and other settlements of issues in dispute.

7.     Defendant BNSF, along with other railroads, are presently participating in national

3

handling with UTU with respect to Section 6 notices served by each side upon the other in November of 2004.

8.    Under the RLA, it is "the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First.

### THE PARTIES' SECTION 6 NOTICE

9.    On November 1, 2004, the NCCC, acting on behalf of BNSF and the other railroads in national handling, served a Section 6 notice on UTU proposing changes to the parties' collective bargaining agreements regarding, among others, trainmen and conductors. UTU served its Section 6 notice shortly thereafter.

10.    Both parties' Section 6 notices contained proposals regarding compensation.

11.    The UTU and the NCCC (and the Class I carriers it represents) met February 14 and 15, 2005 to discuss the carriers' Section 6 notice and UTU's Section 6 notice without reaching any agreement.

12.    Representatives of the parties met again on March 14 - 15, 2005, to discuss those notices, without agreement.

13.    On April 25, 2005, the NCCC invoked mediation by the National Mediation Board pursuant to Section 5 of the RLA, 45 U.S.C. § 155.

14.    UTU and NCCC met in mediation on June 22, 2005, August 16 - 18, 2005, September 7-8, 2005, October 12 - 14, 2005, November 9 - 11, 2005, December 5 - 7, 2005, January 11 - 12, 2006 and February 16, 2006 to discuss the collective bargaining proposals of the parties without

agreeing to changes in the parties' collective-bargaining agreement.

## COMPENSATION AND NATIONAL HANDLING

15.    Compensation has always been handled nationally between UTU and its predecessors

and BNSF and its predecessors, who have used the NCCC as their agent.

16.    For example, in the Agreement of August 20, 2002 between UTU and NCCC, BNSF and

the other carriers in national handling and UTU agreed to changes in the parties' agreement which

provided, in pertinent part, as follows:

### ARTICLE II - OPTIONAL ALTERNATIVE COMPENSATION PROGRAM

#### Section 1

A carrier, at its discretion, may offer employees alternative compensation arrangements in lieu of the general wage increases provided in Article I (in whole or part). Such arrangements may include, for example, stock options, stock grants (including restricted stock), bonus programs based on carrier performance, and 401(k) plans.

#### Section 2

(a) The following conditions shall govern implementation of alternative compensation arrangements pursuant to this Article:

(1) Carrier shall notify the appropriate organization representative(s) regarding its proposed alternative compensation arrangements(s). The parties shall meet promptly on such proposal and use their best efforts to reach agreement on implementation;

(2) The proposed arrangement(s) may be implemented only by mutual agreement of the carrier and the

5

> appropriate organization representative(s);
>
> (3) The proposed arrangement(s) must be made available to the smallest employee grouping that can be reasonably administered.
>
> (b) Nothing herein shall be construed to bar the parties from reaching mutual agreement on different terms or conditions pertaining to implementation of this Article.

## DEFENDANT BNSF HAS VIOLATED SECTION 2 FIRST BY PULLING THE ISSUE OF COMPENSATION OUT OF NATIONAL HANDLING IN THE MIDDLE OF NEGOTIATIONS AND MEDIATION.

19. UTU has subordinate units called General Committees of Adjustment. These bodies have jurisdiction of UTU's agreements covering specific portions of a railroad carrier, or a predecessor carrier which merged with or was bought by another carrier. General Committees of Adjustment have authority to make local or system agreements with representatives of railroads covering rates of pay, rules, or working conditions subject to ratification in accordance with the UTU Constitution, but only the UTU National Negotiating Committee may make national agreements with carriers.

20. On March 2, 2006, BNSF Vice President Labor Relations John Fleps wrote a letter to, among others, these UTU General Committees on BNSF, that provided as follows:

> We would like to raise a subject that may well turn out to be one of mutual interest. As you know, we presently have profit sharing agreements with ATDA, BLET, and the Yardmasters' Department of UTU. And, the employees who are covered by those agreements have done pretty well. We believe there's good reason to have profit sharing agreements with all unions at BNSF, and we would like to talk with you about doing just that

6

under the procedural framework in existing agreements.
You may recall that certain national agreements from the
last bargaining round contain an article entitled
"Optional Compensation Program;" the concluding
paragraph in all of the national agreements mentions
that, "This article will not bar management and
Committees on individual railroads from agreeing upon
any subject of mutual interest."

We will host informational meetings in Fort Worth at
9:00 a.m. on March 30th and April 6th where we'll
explain how all this works, and what our experience has
been. And, we will discuss prospects for new profit
sharing agreements which would be effective in 2006,
modeled on the design incorporated in our 2003
agreement with BLET. We'll also provide lunch.
Please note that because this does involve 2006, and
because we won't be able to make agreements covering
2006 if too much of the year goes by, we would have to
conclude any new agreements (ratification and
signature) by June at the latest.

So, if you're interested in doing something for this year,
please join us in one of these meetings. And, we would
appreciate it if you'd let Karen Ramey (817-352-1091)
know in advance which, if any, meeting you plan to
attend.

21.    BNSF, by this letter, is clearly seeking to address the issue of compensation through

local handling, despite the fact that it is presently engaged in national handling, where the issue of

compensation has always been addressed.

## COUNT I

22.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 21.

23.    As noted, the RLA governs labor relations in the railroad industry. The principal

purpose of the RLA is to "avoid any interruption to . . . the operation of any carrier . . . ." 45 U.S.C.

§ 151 a(1); *see also, e.g., Texas & New Orleans R.R. Co. v. Bhd. of Ry. and SS Clerks,* 281 U.S. 548,

565 (1930) ("[T]he major purpose of Congress in passing the Railway Labor Act was 'to provide a

7

machinery to prevent strikes.'"").

24.     To avoid interruptions to railroad operations and encourage the peaceful resolution of

disputes between carriers and unions, the RLA established two separate mandatory dispute resolution

procedures, one for "minor disputes," and one for "major disputes." The terms "minor dispute" and

"major dispute" are not found in the RLA itself, but are shorthand terms developed by the courts to

describe the RLA's dispute resolution procedures. *See generally Consolidated Rail Corp. v. Ry.*

*Labor Executives' Ass'n.*, 491 U.S. 299 (1989) ("*Conrail*").

25.     A "major dispute" is a dispute over contract formation or amendment of a collective

bargaining agreement. *Elgin, Joliet & Eastern Ry. v. Burley*, 325 U.S. 711 (1945). Parties cannot

engage in self help until after they have exhausted the RLA's major dispute procedures. 45 U.S.C. §§

152 First, 152 Seventh, 156. As noted, the "major dispute" procedures can be initiated by the service

of a bargaining notice under Section 6 of the RLA, 45 U.S.C. § 156, as long as such notices are not

barred by moratorium provisions in the parties' collective bargaining agreement. *See, e.g., Int'l*

*Longshoremen's Ass'n Local 158 v. Toledo Lakefront Dock & Pellet Co.,* 776 F.2d 1341, 1344 (6th

Cir. 1985). The RLA "major dispute" procedures include conference, negotiation, and mediation

between the parties. Until these procedures have been exhausted, the parties are bound by the RLA's

"status quo" requirements. *See e.g., Conrail,* 491 U.S. at 302-03; 45 U.S.C. §§ 152 First, 152 Seventh,

156. Once the RLA's major dispute procedures have been exhausted, the parties are free to engage in

self-help.

26.     Under Section 2 First of the RLA, the parties must "exert every reasonable effort to

make and maintain agreements concerning rates of pay, rules and working conditions." 45 U.S.C. §

152, First.

27.     Under the RLA, compensation is considered an obligatory national handling issue. *See*

*Brotherhood of Railroad Trainmen v. Atlantic Coast Line R.R.,* 383 F.2d 225, 229 (DC. Cir. 1967),
*cert. denied,* 389 U.S. 1047 (1968).

28.    Despite the well-established history of handling compensation nationally between these
parties, BNSF has pulled itself out of national handling regarding compensation in the present and
ongoing round of negotiations between UTU and NCCC.

28.    By unilaterally pulling out of national handling with respect to compensation, Defendant
BNSF violates Section 2, First of the RLA by failing to "exert every reasonable effort" to "make and
maintain agreements regarding rates of pay, rules and working conditions." *See* 45 U.S.C. § 152, First.

29.    As a result, BNSF's action by pulling out of national handling in this manner entitles
UTU to declaratory and injunctive relief under Section 2 First of the RLA, 45 U.S.C. § 152 First,
because wages must be handled nationally because of its practical appropriateness and the historical
methodology of handling past disputes (*BRT v. Atlantic Coast Line R.R., supra),* and because, at a
minimum, once national handling has commenced, no party can withdraw without the other's consent.
*Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404 (1982).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgement against Defendant and respectfully prays that the
Court as appropriate:

A.    Issue a Declaratory Judgment that:

1.    Defendant has violated Section 2, First of the RLA, by unilaterally pulling out
of national handling with UTU and handling the issue of compensation at the local level;

2.    The issue of compensation is a matter for obligatory national handling within
the meaning of the RLA.

B.    Issue injunctive relief enjoining Defendant from pulling out of national handling

regarding compensation and from handling compensation issues with UTU on a local level.

    C.      Award UTU its costs and attorney's fees incurred in this proceeding, and grant such

other and further relief as the Court deems just and proper.

                           Respectfully submitted,

                           Clinton J. Miller, III (D.C. Bar No. 355602)
                           General Counsel
                           United Transportation Union
                           14600 Detroit Avenue
                           Cleveland, Ohio 44107
                           Tel: (216) 228-9400
                           Fax: (216) 228-0937

                           Joseph Guerrieri, Esquire (D.C. Bar No. 165555)
                           Guerrieri, Edmond, Clayman & Bartos
                           1625 Massachusetts Avenue, N.W., Ste. 700
                           Washington, DC 20036-2243
                           Tel: (202) 624-7400
                           Fax: (202) 624-7420

                           Attorneys for Plaintiff
                           United Transportation Union